**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

NIKHIL WAHI,

Defendant.

22-CR-392 (LAP)

**SENTENCING MEMORANDUM ON BEHALF OF NIKHIL WAHI**

Dated: December 27, 2022

ChaudhryLaw PLLC

By:     _/s/ Priya Chaudhry_
Priya Chaudhry
147 West 25th Street, 12th Floor
New York, New York 10001
Tel: (212) 785-5550
priya@chaudhrylaw.com

_Attorneys for Defendant Nikhil Wahi_

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

I.   PRELIMINARY STATEMENT ................................................................................ 1

II.  NIKHIL'S PERSONAL HISTORY AND CHARACTERISTICS ............................. 3

   A.  The Guilt of Using His Parents' Retirement Savings to Fund His Studies in the
   United States. ............................................................................................................ 3

   B.  Deportation Is a Punishment for Nikhil and Will also Accomplish the Goal of
   Deterrence. ................................................................................................................ 6

III. THE ADVISORY GUIDELINES CALCULATION ................................................ 18

   A.  The Probation Department's Recommendation. ..................................................... 18

   B.  The Loss Calculation Here ..................................................................................... 20

IV.  A BALANCED CONSIDERATION OF ALL RELEVANT FACTORS UNDER 18
U.S.C. § 3553(A) DEMONSTRATES THAT A NON-CUSTODIAL SENTENCE IS
SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO ACHIEVE THE
GOALS OF SENTENCING .......................................................................................... 23

   A.  A Non-Custodial Sentence Is Consistent with Sentences Imposed on Substantially
   Similar Defendants Convicted of Similar Conduct. ............................................... 24

   B.  A Non-Custodial Sentence Will Be More Than Sufficient to Achieve the Goals of
   Specific and General Deterrence. ........................................................................... 25

   C.  A Period of Incarceration Will Impose Substantial Burden on Nikhil's Family in
   the Middle of a Global Pandemic ........................................................................... 28

   D.  A Non-Custodial Sentence Serves the Interests of the Federal Prison System and
   Is Fair to Nikhil. .................................................................................................... 30

      1.  COVID-19 .......................................................................................................... 30

      2.  Additional Public Interest Considerations ....................................................... 34

V.   CONCLUSION ........................................................................................................ 34

# **TABLE OF AUTHORITIES**

**CASES**

*Rita v. United States*,
   551 U.S. 338 (2007). ...................................................................................................24

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) ......................................................................18

*United States v. Bills*,
   401 Fed. Appx 622 (2d Cir. 2010)............................................................................28

*United States v. Corsey*,
   723 F.3d 366 (2d Cir. 2013) .....................................................................................21

*United States v. Crosby*,
   397 F.3d 103, 113 (2d Cir. 2005) ........................................................................18, 24

*United States v. Dorvee*,
   616 F.3d 174, 182 (2d Cir. 2010) ..............................................................................24

*United States v. Gupta*,
   904 F.Supp.2d 349, 354 (S.D.N.Y. 2012) ...........................................................passim

*United States v. Isola*,
   548 Fed. App'x 723 (2d Cir. 2013)............................................................................28

*United States v. Johnson*,
   964 F.2d 124, 128 (2d Cir. 1992) ..............................................................................28

*United States v. Nkanga*,
   18-CR-713 (JMF), 2020 WL 1529535, *1 (S.D.N.Y. Mar. 31, 2020), *reconsideration denied*,
   18-CR-713 (JMF), 2020 WL 1695417 (S.D.N.Y. Apr. 7, 2020) ............................32

*United States v. Velazquez*,
   No. 16-cr-233, 2017 WL 2782037, *4 (S.D.N.Y. May 26, 2017) ...........................27

**STATUTES**

18 U.S.C. § 3553(a) .....................................................................................................passim

18 U.S.C. § 3553(a)(1) ...................................................................................................23

18 U.S.C. § 3553(a)(2) ...............................................................................................23, 25

18 U.S.C. § 3553(a)(3) ...................................................................................................23

18 U.S.C. § 3553(a)(4) ......................................................................................23

18 U.S.C. § 3553(a)(6) ..................................................................................23, 24

18 U.S.C. § 1349 ................................................................................................2

**OTHER AUTHORITIES**

Barbara Buckinx & Alexandra Filindra, *Removal and Harm Avoidance in U.S. Immigration Practice*, 22 KAN. J.L. & PUB. POL'Y, Summer 379, 379 (2013) ...............................8

Faulders, Katherine, *Former Trump Campaign Chairman Paul Manafort Released to Home Confinement Amid Coronavirus Concerns*, ABC News, (May 13, 2020) *available at* https://abcnews.go.com/Health/trump-campaign-chairman-paul-manafort-released-home-confinement/story?id=70642927 ...............................................................33

Federal Bureau of Prisons COVID-19 Resource Page, available at https://www.bop.gov/coronavirus/index.jsp.................................................31

*Former St. Gabriel mayor released early from federal prison*, WAFB9, (May 28, 2020) *available at* https://www.wafb.com/2020/05/28/former-st-gabriel-mayor-released-early-federal-prison/..................................................................................33

Gurman, Sadie, *Trump's Lawyer Michael Cohen Released To Home Confinement*, *The Wall Street Journal*, (May 21, 2020) *available at* https://www.wsj.com/articles/trumps-former-lawyer-michael-cohen-released-to-home-confinement-11590075443.....................................33

Judge Colleen McMahon, "*In Her Own Words: Federal Judge Slams 'Morons' Running NYC Jails*", NY Daily News, May 7, 2021 ...............................................................31

Killman, Curtis, *Former Arrow Trucking CEO released from prison to go to home confinement*, Tulsa World, (May 7, 2020) ...............................................................33

MARIA VITTORIA GIULIANI, PSYCHOLOGICAL THEORIES FOR ENVIRONMENTAL ISSUES 137–169 (2016).............................................................................................7

Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment Purposes)*, 58 STAN. L. REV. 67 (2005)...............................................27

U.S.S.G. § 2B1.1 Commentary Application Note 3(B)--Gain .....................................21

United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (March 2016)...............................................................26

United States Sentencing Commission, *Recidivism And The "First Offender"* (May 2004) .......26

*18 U.S.C. Section 3553(a) "requires a court to take account of a defendant's character in imposing sentence.  And how could it be otherwise, for on this day of judgment, must not one judge the man as a whole?"*[1]

## I.      PRELIMINARY STATEMENT

Each year, thousands of Indian students come to the United States hoping to achieve the American Dream.  They come from kaleidoscopic backgrounds.  Some are from elite families, having gotten legacy admissions in top American universities.  Some, blessed in other ways than being born into wealthy households, are on fully funded scholarships and grants.  But a few are sons and daughters of working-class parents who gave their children their retirement funds and savings, worth a lifetime of toil and labor, wishing them to have a life they did not get to live.  Nikhil Wahi, the man before this Court today, belongs to this last category.[2]

In addition to the pressures and anxieties that travel with a young man moving to a strange land, Nikhil was also carrying a peculiar burden—the overwhelming feeling that he had to repay the debt to his parents.  His parents did not consider it a debt.  They had not asked for anything back.  But Nikhil knew he had to find a way to return it, not just what they expended but a sum many times over.  Before even starting his educational journey, he knew that there was no other choice but to "make it."  From being an $8 per hour dishwasher in the student dining hall during college in Illinois, to finally landing a great job with Salesforce, the whisper of his debt remained in his ear.  This burden, which kept increasing in size and eventually turned into overwhelming guilt as time passed, formed the basis of Nikhil's worst mistake, bringing him before this Court.

---

[1] *United States v. Gupta,* 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012).

[2] Throughout this Sentencing Memorandum, we refer to Nikhil Wahi as "Nikhil" or "Mr. Wahi."

Nikhil recognizes the seriousness of his offense and the need for just punishment.  He, however, respectfully asks this Court to consider his personal history, circumstances, and upbringing and impose a non-custodial sentence.  Warm and loving letters from Nikhil's family and friends describe the type of young man any of us would want in our family—respectful, dedicated to his parents and elders, loyal, thoughtful, reliable, kind, and generous.  Before this case, Nikhil had never been arrested, and there is zero indication that he is a person capable of repeating his conduct.  In all respects, Nikhil's conduct was an aberration, and there is no likelihood of it occurring again.

Nikhil comes before this Court having pleaded guilty to a single count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, arising from his involvement in an insider trading scheme in crypto assets that were listed, or were under consideration for listing, on Coinbase Global, Inc.  This errant judgment has cost him absolutely everything—his life in America, his future with his partner, his excellent job, and his good name.  This mistake has not only ruined his own life but has broken his heart as he has watched the damage his actions have caused to his beloved family.  It has resulted in Nikhil ████████████████████ ████████████████████████████████████████████████ ████████████████████

We join the Department of Probation and ask Your Honor to impose a non-custodial sentence.  We submit that such a sentence is just and fair because it takes into account Nikhil's history and characteristics, the facts and circumstances of the offense, and meets the statutory requirement of 18 U.S.C. § 3553(a) that a court impose a sentence that is "not greater than necessary" to achieve the goals of punishment.

Nikhil Wahi respectfully submits this memorandum in connection with his sentencing.

2

## II.    NIKHIL'S PERSONAL HISTORY AND CHARACTERISTICS[3]

### A.    The Guilt of Using His Parents' Retirement Savings to Fund His Studies in the United States.

Nikhil grew up in a middle-class, working family in India.  His mother, Kavita Wahi, and his father, Sanjay Wahi, both reside in India.  His father was a wholesale merchant who sold raw fabrics to manufacturers before the operation was moved to China, forcing his business to close. His father suffers from ███████████████████████████████, and his mother is currently self-employed as a clothing manufacturer.  Nikhil's parents have worked tirelessly to ensure he received a good education and access to all of life's necessities.

Nikhil's parents spent nearly half a million dollars on his and his brother's education. Growing up, Nikhil saw his parents putting their children first before anything.  He saw them sacrifice all their wants to give their children the best tools possible to succeed.  Faced with mammoth college costs in the United States, Nikhil's parents were forced to make difficult decisions about how to pay for his and his brother's education in the United States.  Stress and conflict invariably accompany financial issues and play a role in the economic picture for many families; Nikhil's case was no different.  Although it instilled in him a sense of deep gratitude, he began to feel an overwhelming burden of ensuring that all the investments in him paid adequate dividends.  This background led to Nikhil having a severe lapse in judgment.  He did not act out of greed or to enrich himself; his main objective was to repay his parents for all they did for him and to ensure that their retired life would be smoother and more manageable than their working life had been.

---

[3] We rely on the excellent description of Mr. Wahi's background in the Pre-Sentence Investigation Report ("PSR") and supplement it here.

Nikhil's mother, Kavita Wahi, recalls the hardships faced by her and Nikhil's father during the process of funding Nikhil's education:

> Nikhil has always been academically inclined and it was our duty as his parents to provide him with the best possible platform we could, to further his interests.  We have wanted a good education and a strong value system to be our legacy for our children.  It has been a financial strain to fund Nikhil's education in the USA, but we knew that was the best environment for him to learn in and grow.  We had to use up a large part of our savings and had to adjust our lifestyle to curtail our everyday expenses.[4]

Nikhil understandably feels an immense sense of gratitude to his parents.  Coupled with that gratitude is the shadow of guilt for living so far away from the people who now face their old age without their children.  So even from the other side of the globe, Nikhil has remained strongly attached to his beloved parents.  His mother recalls the care and support Nikhil exhibited during ████████████ while visiting them in March of this year.  Nikhil's father ████████████████████████████████████████████████████████ ████████████████████████ "Nikhil just took over, the visits to various doctors, the hospital visits and just sitting by his father's bedside all through."[5]  This gave his mother time to recover from her mental and physical strain.

Having seen his parents sacrifice so much for him, Nikhil continuously tried to do whatever he could to reduce the financial strain on his parents.  He started by working as a dishwasher in the student dining hall at the University of Illinois at Urbana-Champaign in 2014, for which he was paid a rate of approximately $8 per hour.  While attending college and during

---

[4] *See* Exhibit A-1 - Letter by Kavita Wahi.

[5] *Id*.

summer breaks between 2016 and 2017, Nikhil also held part-time positions with various employers, for which he was paid between approximately $15 and $50 per hour.

It was only in 2018, however, after graduating with a Bachelor of Arts degree in economics and a Bachelor of Science degree in computer engineering, that Nikhil started to earn a decent living.  His plan all along was to save enough so he could begin sending remittances to his parents back in India.  Despite living conservatively, Nikhil could not accumulate enough savings to get into a financial position that would have enabled him to send money back to his parents.  Moreover, after analyzing the job market in the software industry, Nikhil also planned to enroll in a postgraduate program in 2023.  This would have meant spending $250,000 over the course of two years while not making any income.  Because financial aid is severely limited for non-citizen students in America, he knew that he would have to ask his parents to financially support him yet again, further causing a serious dent in their savings and putting them under immense pressure.

Nikhil's guilt over causing his parents further financial strain proved too much for him, leading him to exercise a serious lack of judgment, which led to the actions for which he has pleaded guilty.  When he saw an opportunity that would enable him to make his parents' retirement smoother, he committed a mistake utterly incongruent with his character.  Life became complicated for him, not due to the usual reasons that come about in the form of an illness, economic bankruptcy, or family breakdown.  Sociology recognizes numerous other turbulent events and crisis modes besetting people and, sometimes, the whole society.  These conditions become a catalyst in the process of applying deeper moral justifications for human actions.  Nikhil found himself in a situation where none of the available solutions seemed to him

to be entirely satisfactory, causing him to fall into error—error for which he will atone until the day he dies.

### B.  Deportation *Is* a Punishment for Nikhil and Will also Accomplish the Goal of Deterrence.

For Nikhil, deportation will be a very painful and permanent punishment for his conduct. Before this Court is a 27-year-old young man who came to the United States nine years ago, committed to living the American Dream.  He left behind his family, his friends, and everyone he knew.  The goal was simple—to make a life for himself in the promised land.  He was on the right track.  He studied as hard as possible and, among other things, served as a Teaching Assistant in computer science for several semesters, played intramural cricket, and was a member of the school's Rotary Club during his matriculation.  After four years of work, he was awarded a Bachelor of Arts degree in economics and a Bachelor of Science degree in computer engineering, graduating with an overall GPA of 3.48.  In terms of specialized training and skills, he completed numerous work-related courses pertaining to computer software, programming, technology, and general skills.  He became multi-lingual, achieving fluency in English, Hindi, and basic Spanish.  Subsequently, he joined Salesforce, Inc. as a Senior Product Manager, building software to ensure the usability and proper working order of software utilized by clients, including Fortune 500 companies across various industries.  Plus, he met his match—a wonderful young American computer science engineer—and they began a relationship headed toward marriage.  All was well.  He could see he was close.

And then he slipped and made the worst mistake of his life.  He is aware that all his toil and labor of the last nine years have simply become dust.  After this Court sentences him, he will

be deported to India.[6]  He will have to start from scratch and build again.  He will not have the resources and the opportunities that America offers him.  He will not have a similar chance again to succeed purely on merit and hard work.

Unfortunately, it will not end there.  Nikhil will also suffer emotionally.  For the past three years, he has been romantically involved with Pranathi Tupakula, whom he met through mutual friends.  Pranathi was born in America, has a master's degree in computer science, and is currently employed as a ███████████████████.  Nikhil will have to leave Pranathi and their future promises and dreams behind as he flies away from this land forever.

Additionally, he will be uprooted from a place that he has called home for nine years.  Rootedness has been called an unconscious attachment to a place due to familiarity achieved through continuous residence.[7]  The attachment developed to a place, especially a strange one that eventually becomes a home, is multi-dimensional and cannot be explained simply through a cause-and-effect relationship.  It depends on a reciprocal relationship between behavior and experiences.  For Nikhil, America became a home over the course of these nine years—his entire adult life.  And now, he will be forced to say farewell to it.

Importantly, even though Nikhil was born in India and lived there until he was seventeen, returning to India for him will neither be seamless nor without significant long-term disadvantages.  Deportation is often accompanied by severe economic and social harm.  The ability of an individual to pursue economic and social fulfillment in any given society depends on the compatibility of his skills and abilities with that particular economy and society.  A long-

---

[6] Should the Court sentence Mr. Wahi to "time-served," the parties have agreed to propose a method of self-deportation for Mr. Wahi that would be acceptable to the Court.

[7] MARIA VITTORIA GIULIANI, PSYCHOLOGICAL THEORIES FOR ENVIRONMENTAL ISSUES 137–169 (2016).

term resident who is repatriated to his country of origin often does not have the skills or social networks required to pursue a livelihood comparable to the one he had in the host country.  In addition, in countries where the economy is dominated by the state, or where state approval may be a condition for employment, a deportee may have an especially difficult time gaining employment.

Many immigrants come to the United States from countries like India, which suffer from chronic economic problems.  Local economies may produce few well-paying jobs, and most jobs may be in sectors that combine physical hazards, long hours, and low pay.  The few well-paying jobs may be distributed in a non-meritocratic way, making it very difficult for individuals who have not been part of specific networks to compete effectively.  Even countries of origin that have flourishing economies may depend on jobs for which their long-departed citizens are ill-prepared.  Skilled, white-collar jobs, for instance, tend to require both language proficiency and an understanding of the structures and institutions of the state.  A recent deportee may lack most, if not all, of these.[8]

For Nikhil, deportation will lead to substantial economic disadvantages in several ways.  First, he may not be able to perform the job for which he has trained for years and for which he has given his blood and sweat to acquire the necessary skills.  Second, because of his prolonged stay in the United States, he lacks the skills that would make him competitive in the local economy back in India.  Third, he lacks the social connections necessary to secure employment because in India, the system for obtaining employment is not as merit-based as in the United

---

[8] Barbara Buckinx & Alexandra Filindra, *Removal and Harm Avoidance in U.S. Immigration Practice*, 22 KAN. J.L. & PUB. POL'Y, Summer 379, 379 (2013).

States.  And finally, social prejudice directed at deportees may lead him to face discrimination and economic deprivation.[9]

Even if Nikhil is able to find employment at a comparable level to what he had in the United States, he may suffer from a lack of social acumen and savoir-faire and therefore be subject to social discrimination.  This is because Nikhil has never worked, in any capacity, in India—he has no experience navigating the nuances of an Indian workplace whatsoever.  In this regard, he would be no different than a 28-year-old American professional with a high-profile criminal record sent to India to try and find a professional job.

The man before this Court needs no further punishment to deter him from future criminal acts.  First, once he is sentenced, Nikhil will be deported and thus will never again be able to commit any crimes on American soil.  Second, by getting deported, he will suffer a far greater punishment than any law can impose upon him.

### C.   Nikhil Always Places the Needs of His Family First.

People that are close to Nikhil attest to the love and care he has for his family.  He truly is a man who always places his family's needs first.  Shyla Minocha, Nikhil's cousin, considers herself "lucky enough to grow up with Nikhil as an older brother."[10]  She recounts Nikhil setting "an example as an excellent son, sibling, student, and worker."[11]  Because of how much care Nikhil shows for his family, Shyla views Nikhil as a blueprint for how to conduct herself in her family.[12]

---

[9] *Id.* at 383.

[10] *See* Exhibit A-2 - Letter by Shyla Minocha.

[11] *Id*.

[12] *Id*.

Shyla recalls the tradition of her and Nikhil's grandparents hosting their families every week. Every week, without fail, the family would be greeted by Nikhil, who would show up early in the morning to help his grandparents. Disregarding his own schedule and routine, Nikhil would be there, knowing how much it meant to his grandparents to have that quality time. In Shyla's words, "You could always count on Nikhil to be around," and Shyla "wanted to be that kind of warm, dependable person."[13]

Even now, as Nikhil waits in the suffocating uncertainty between pleading guilty and hearing this Court's sentence, he financially supports his brother. Nikhil has one brother, co-defendant Ishan Wahi, with whom he resides in Seattle, Washington. Nikhil provides financial support for his brother, who was laid off from his position as a Product Manager at Coinbase following his arrest for the instant offense.

Nikhil's uncle, Salil Kapoor, also describes Nikhil's compassion and consideration for his family and how Nikhil has regularly stayed connected with all the family elders in India, including Salil. Salil has continuously seen "[Nikhil's] compassion shine through as he has always allocated a significant percentage of his limited time during his India visits in attending to ████████████████████████████."[14]

### D. Nikhil Always Puts Others before Himself and Extends a Helping Hand.

As a profoundly compassionate person, Nikhil always feels motivated to bring happiness and relieve the suffering of others. He believes that by fostering empathy and displaying compassion toward other people, people can overcome the vilest actions and greatest atrocities committed by others. In his mother's words, "Nikhil has deep-rooted core humane values

---

[13] *Id*.

[14] *See* Exhibit A-3 - Letter by Salil Kapoor.

instilled in him."[15]  Every time Nikhil visits his home in India, he makes arrangements for food distribution to the homeless.

Nikhil's true commitment to bettering the lives of others was not born of a panicked post-arrest intention to impress the Court; rather, this is his true persona that he has exhibited throughout his life.  In 2019, while on a volunteer trip to Bali, he volunteered at a turtle sanctuary, helped with beach cleaning, distributed school supplies, spent time with children at an orphanage, and distributed water filters in a village.  While in high school in India, Nikhil would regularly visit shelters for abandoned dogs, where he would play with them, feed them, and help keep the area clean.  He also led his school team in a documentary film competition to make a documentary on the everyday life of the visually impaired, spreading the message of "Gainful Employment for the Visually Challenged."  The documentary was uploaded on YouTube, and its screening was organized at various schools.  Nikhil has also volunteered at Give Food Foundation, a Non-Government Organization that provides free meals for the underprivileged.[16]  Nikhil has also sponsored the education of underprivileged children in India and Kenya over the years by supporting non-profit organizations like the Weiss Scholarship Foundation and Save the Children Fund.

While he was in college, Nikhil volunteered as a tutor for ten hours per week and organized a fundraiser (through his involvement with the Rotary Club) and raised $5,000 for the End Polio Now campaign.  Even as a young professional at Salesforce, Nikhil made time to give back to the Seattle community: he helped non-profits in the area set up their websites and helped build the garden at the Children's Library in Bellevue, Washington.

---

[15] *See* Exhibit A-1 - Letter by Kavita Wahi.

[16] *Id*.

Nikhil's close friend of nine years, Krishna Thaker, recounts her first interaction with Nikhil when, during the initial days of her immigrating to the United States and starting college, her laptop broke down.  For two weeks, Nikhil loaned her his laptop for three to four hours each day after his classes so she could complete her work.  She states: "Nikhil has profoundly impacted me throughout my life, and I owe him a lot for the person I am today."[17]

During the early days of college, while Krishna struggled with the transition of becoming independent, Nikhil would often check up on her to make sure she was eating well, staying active, and taking care of herself.  Writing about Nikhil's giving nature, she states: "He enjoyed mentoring a lot and was passionate about teaching and supporting others—friends and strangers—but he would rarely take credit for his help or effort.  He was a tutor for computer science classes and got so much joy from helping others learn."[18]  Because Krishna never learned how to drive, Nikhil spent countless hours each weekend for a few months sitting next to her in his car, helping her practice, and building her confidence.  Krishna also recalls how Nikhil intervened multiple times █████████████████████████████████████████

████  Countless times, after a night out, Nikhil drove and escorted Krishna and her friends to their homes to make sure they got home safely.[19]

One incident that starkly stands out to Krishna is when, during her last year in college, ██
███████████████████████████████████.  Finding a confidant in Nikhil, she recalls:



---

[17] *See* Exhibit A-4 - Letter by Krishna Thaker.

[18] *Id*.

[19] *Id*.

> The one day I owe him for the most was when he woke up in the middle of the night and drove me to the airport in Chicago at 4 a.m. from our campus town—a 7-hour round-trip drive—because I had overslept and missed the bus I needed to take to fly to New York where I was the officiant for my sister's wedding ceremony later that day. I wouldn't have made it in time had I missed the flight and Nikhil was once again there to support me in a time of crisis without complaining much about it. Not just with his words and wisdom, he has supported his friends monetarily as well; he had lent one of our friends multiple months of rent money in recent years when she was going through a difficult time.[20]

Ankur Gupta, who went to college with Nikhil, similarly remembers how Nikhil once drove him 130 miles from Champaign, Illinois, to Chicago, just for the sake of helping him during a stressful time. Like with all others in his life, Nikhil was available to help Ankur in stressful times, providing help, transport, and good company. He helped Ankur with finding a job, advising him with his applications and interviews.[21]

Anweshita Das, another friend of Nikhil's from college, shares how Nikhil tutored her for a computer science course that she was struggling with. Despite having his own heavy workload, Nikhil happily set aside time to teach her and put her in touch with his other friends whom he thought could help her learn the subject better. Nikhil's tutoring ultimately helped Anweshita get a better grade in that class. Because Anweshita had taken out student loans to pay for her degree, she did not feel comfortable asking her parents for money. Recalling an incident

---

[20] *Id.*

[21] *See* Exhibit A-5 - Letter by Ankur Gupta.

when she was at risk of getting evicted, she remembers how Nikhil lent her $500 to help her pay her rent and how, to this day, he has not asked for that money back.[22]

Asavari Tayal, Nikhil's study mate and lab partner from college, always considered Nikhil her "top choice to collaborate with because of his strong work ethic and dependable nature."[23]  She remembers the occasion when one night at 9:00 p.m., she requested Nikhil's help to tutor her for a Physics exam scheduled for 8:00 a.m. the next day.  She states that although her request was unreasonable, "Nikhil selflessly showed up to provide his support despite having multiple deadlines and an early morning himself."[24]  In her opinion, "Nikhil is simply just one of those people who goes out of his way to help others,"[25] and she narrates an experience about Nikhil going out of his way to help her cousin who got ███████████████████. ███ Due to the shortage of medical care in India at the time, Asavari's family was unable to secure a hospital bed for her cousin.  In desperation, Asavari reached out to Nikhil for help. Nikhil "went above and beyond"[26] to help Asavari out, despite being thousands of miles away.

> He promptly amplified the need via social media and proactively reached out to both his and his father's network.  At a time when finding medical care seemed almost impossible, and dozens of friends and family could be of no help, Nikhil came through. . . .  Thanks to his efforts, within a day, [Asavari was] ███████████████[27]

---

[22] *See* Exhibit A-6 - Letter by Anweshita Das.

[23] *See* Exhibit A-7 - Letter by Asavari Tayal.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

Asavari and her family feel they "will forever be indebted to Nikhil and his family for their sympathy and active, steadfast support."[28]

Girish Minocha, a close relative, recalls how Nikhil, while in Grade 12 in India, called Girish one day "all proud and excited, sharing how he had participated in creating a documentary to help Visually Impaired get better employment opportunities."[29]  Nikhil continued to be in touch with Girish over the next several weeks until he convinced him to hire his first visually impaired team member and create a conducive work environment for her.  Girish proudly recalls that "even as a young adult Nikhil wanted to make a difference."[30]

Shrujan Cheruku, a friend of eight years, shares what Nikhil's support meant to him when ███████████████████████████████████████████████████ ███████████████████████████████  The worst of it was during his student days, but he recalls, "[O]ne person who was there for me then was Nikhil.  He never treated me differently or turned his back on me, ███████████████████.  He didn't show this through words, he showed it through real actions."[31]  Elaborating on how Nikhil supported him, he writes:

> I'm not talking about grand, life-changing gestures.  It's the little things such as reaching out and socialising, cleaning up after you, cooking a meal, etc.  What really mattered is that they were consistent moments, and they happened with regularity over the years.  I've seen a similar attitude towards others in my time knowing him.  He's always willing to help anyone who asks, and will make a genuine effort to be there for others.
>
> For someone to do that for the best part of a decade is to me an incredible quality.  Whether it's driving for hours in the middle of

---

[28] *Id*.

[29] *See* Exhibit A-8 - Letter by Girish Minocha.

[30] *Id*.

[31] *See* Exhibit A-9 - Letter by Shrujan Cheruku.

the night to help someone who missed a bus, or just cooking breakfast, it's the same empathy for others that makes him who he is.  The consistency of this behaviour over time makes me sure of it.  That's why I will support him when he needs it reciprocated.[32]

Pranathi Tupakula, Nikhil's girlfriend of four years, writes about how Nikhil also inspired her to give back to the community with her time, love, and money.  She recalls the numerous times Nikhil, during their walks through the neighborhood, would stop and chat with a homeless person, asking him how he could help him.[33]  "Whether they respond by saying food, clothing, blankets or just plain money, Nikhil ensures that he goes back the next day and brings it to them, oftentimes catching them by surprise and making their day."[34]  Nikhil would also help Pranathi plan fundraising events that raised thousands of dollars for those in need.[35]

According to Anurag Choudhary, one of Nikhil's closest friends, Nikhil

> has only the best interests for everyone he interacts with and is close to—he goes above and beyond to ensure people are comfortable, happy, and feel important around him.  The past events are only a ripple in his otherwise deep and pristine character.  He's been an amazing friend, mentor, and role model for me.[36]

These letters demonstrate that Nikhil loves his family dearly, his friends are the light of his life, and everyone cherishes their relationship with him.  He is an amazing son, colleague, and friend.  Every one of Nikhil's friends, family members, and acquaintances has been touched

---

[32] *Id.*

[33] *See* Exhibit A-10 - Letter by Pranathi Tupakula.

[34] *Id.*

[35] *Id.*

[36] *See* Exhibit A-11 - Letter by Anurag Choudhary.

and has benefited by having him in their lives.  This is a remarkable achievement for a man only 27 years old.

### E.    Nikhil's Volunteer Work While Awaiting Sentencing.

The painful hours and minutes of suspense and uncertainty between a guilty plea and the pronouncement of a sentence cannot be imagined until lived.  For three months, Nikhil has laid awake at night, ███████████████ fear, and shame; every moment made worse knowing that his family in India is also hostage to this suffering suspense he has caused.  This young man, previously busy at his great job at Salesforce, a regular at the gym, and an asset to his friends and community, suddenly found himself with nothing but slowed-down time in which to host his raging fears.  But what Nikhil has done in this doomed time vacuum that easily sucks in and devours others shows the Court his true nature.  He has decided to spend every last day in America giving back to the land he loves and will leave forever.

Since August, when Salesforce put Nikhil on an administrative leave,[37] Nikhil has devoted himself to volunteer work.  Knowing that with his arrest, guilty plea, and impending deportation, finding a job is impossible, Nikhil chose to utilize his talents, gifts, and energy to better the lives of others.  He swapped out his hours in the office to teach English as a Second Language, tutoring adults in basic math, and trying to leave some small positive legacy of his time in this country.[38]  This speaks volumes about Nikhil's character and is further proof of the aberrant nature of his offense.

---

[37] Following his guilty plea, Salesforce has terminated Nikhil.

[38] *See* Exhibit A-10 - Letter by Pranathi Tupakula.  *See also* PSR, ¶80.

One of the first factors identified for consideration under 18 U.S.C. § 3553(a) is "the history and characteristics of the defendant."  As recognized by Judge Rakoff in *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006):

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.
>
> This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics" of the defendant.

As laid out above, Nikhil is not on the verge of a crime spree that must be stopped with imprisonment; he is a sweet, gentle tutor who has already returned to the path of a good citizen. Nikhil's criminal acts here are indeed aberrant behavior, and we urge the Court to sentence him accordingly.

## III.   THE ADVISORY GUIDELINES CALCULATION

Loss calculation is a clumsy, inarticulate way to create a mathematical formula to calculate the moral harm caused by a defendant's conduct.  Nonetheless, because this Court must determine the Advisory Guidelines, we address them here.

We do not dispute the guideline calculation set forth in the PSR, which is consistent with the parties' calculation in the plea agreement.  This range is purely advisory.[39]

### A.   The Probation Department's Recommendation.

In view of what has been discussed above, it is not surprising that the Probation Department recommends a sentence of time-served and a $15,000 fine for Mr. Wahi after

---

[39] *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).

carefully considering all relevant factors and evaluating Mr. Wahi's enormous, sincere remorse.[40]  Importantly, despite learning of the additional wallets turned up in the government's investigation *after* Mr. Wahi's plea, the PSR states:

> The Probation Office recognizes the seriousness of this offense, which resulted in significant financial gains to the defendant and his co-conspirators, as well as potential losses to Coinbase.  It appears, however, that Nikhil Wahi was significantly less culpable than his brother, Ishan Wahi, who worked for Coinbase and flagrantly abused a position of trust by directly misappropriating the confidential information used in order to facilitate the offense. . . . The defendant is a first-time offender who has otherwise been a contributing member of society, whereby he achieved higher education and has a prior history of gainful employment, as well as vocational skills which he is currently utilizing in order to volunteer and give back to his community.  The defendant also has a supportive family undoubtedly willing to assist him with his future endeavors.  Additionally, the defendant has been in full compliance with the conditions of his pretrial supervision while at liberty since his arrest, thereby showing that he is a suitable candidate for community-based supervision. For all the reasons stated, we do not believe that a custodial sentence is necessary in order to serve justice in this case.[41]

Importantly, however, the PSR does not account for the current COVID-19-related conditions that make incarceration a particularly treacherous punishment.  We submit that when the additional relevant factors are properly considered, the appropriate sentence for Nikhil would indeed be a non-custodial one.

---

[40] *See* PSR, pg. 28.

[41] PSR, pg. 30.

B.      The Loss Calculation Here.[42]

> Imposing a sentence on a fellow human being is a formidable responsibility.  It requires a court to consider, with great care and sensitivity, a large complex of facts and factors.  The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily[]selected variables wars with common sense.  Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.[43]

Judge Rakoff shared this salient reasoning and observation in crafting the right sentence for Rajat Gupta, who was mechanically tacked with an 18-point enhancement for loss amount "for the resultant but unpredictable monetary gains made by others, from which Mr. Gupta did not in any direct sense receive one penny."[44]

As Judge Rakoff profoundly noted while sentencing Mr. Gupta, "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of

---

[42] Under the ABA Shadow Guidelines (attached hereto as Exhibit B), if a defendant has zero criminal history points under Chapter 4 and the offense was not "otherwise serious" within the meaning of 28 U.S.C. § 994(j), the offense level shall be no greater than 10 and a sentence other than imprisonment is generally appropriate.  In determining whether an offense is not "otherwise serious," the court should consider (1) the offense as a whole, and (2) the defendant's individual contribution to the offense.  For example, a low-level employee who is peripherally involved in what would be an "otherwise serious" offense as to other defendants may nevertheless qualify for this offense level cap.

As confirmed by the PSR at ¶57, Nikhil has no criminal history points and a corresponding Criminal History Category of I.  Considering the personal gain amount of $54,100, PSR at ¶47, the duration of the offense conduct, and the nature of Nikhil's participation, Nikhil qualifies for this offense level cap.  As such, the offense level under this guideline shall be no greater than 10, the sentencing range would be 6–12 months, in Zone B, and a sentence other than imprisonment would be appropriate.

[43] *Gupta,* 904 F. Supp. 2d at 350.

[44] *Id.*

speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice."[45]  Nowhere is this truer than the Sentencing Guidelines' oversized treatment of loss amount.

> The Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense.  By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentence would be irrational on their face.[46]

In a concurrence in *United States v. Corsey*,[47] Judge Underhill, sitting by designation, noted the flawed nature of the Guidelines for high-loss cases:

> The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb.  ***The higher the loss amount, the more distorted is the guideline's advice to sentencing judges***.  As a well-known sentencing commentator has put it, "For the small class of defendants . . . convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense.  Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges."[48]

For Nikhil, the Court's tabulations must look to Nikhil's gain, as "loss" cannot be reasonably determined.[49]  Here, the gain/loss calculation for Nikhil perfectly proves this Court's

---

[45] *Id.* at 351.

[46] *Id.*

[47] 723 F.3d 366 (2d Cir. 2013).

[48] *Id*. at 380 (emphasis added).

[49] U.S.S.G. § 2B1.1 Commentary Application Note 3(B)--Gain: The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.

hypothesis in *Gupta* and Judge Underhill's observation; if gain/loss calculation dominates this Court's rationale, it will lead to an irrational sentence.  First, the PSR's offense level calculation of 12 results from a 6-level enhancement for gain/loss amount.[50]  In other words, loss amount comprises 50% of the offense level.  Put another way, the loss enhancement proposed by the PSR constitutes half of the offense level here.  As in *Gupta*, the PSR's loss calculation "overwhelm[s] all other factors."[51]

We address here the difference between the gain amount in the parties' plea agreement and the additional profits uncovered by the government's subsequent investigation.  First, the lower gain amount captured by the plea agreement reflects brightly on Mr. Wahi's acceptance of responsibility—in other words, he quickly sought to plead guilty and spare the government's resources in this prosecution.  In fact, in making the early offer, the government acknowledged that it was still investigating.[52]  Importantly, the government has stood by its original plea agreement, despite its subsequent investigation; further, the government agrees that Mr. Wahi has accepted responsibility and certainly does not claim that Mr. Wahi misled the government during this investigation or plea negotiation.

Second, while there is a large difference between the gain number in the plea agreement and the gain number subsequently uncovered, there is absolutely no difference in the actual gain to Mr. Wahi, which is zero.  That is, Mr. Wahi has consented to forfeit $54,100 in cash (and will do so on the day of sentencing), and the government has seized (and will forfeit) the wallets

---

[50] *See* PSR, ¶7.

[51] *Gupta*, 904 F. Supp. 2d at 353.

[52] In fact, Mr. Wahi is both the least culpable and the only defendant to have pled guilty in this matter.  Ishan Wahi continues to litigate this case and Sameer Ramani, though an American citizen, remains a fugitive from justice and has thus far refused to even face these charges.

containing nearly all the rest of the later-found profits.  Third, we note the irony that Mr. Wahi

gambled away his whole life on cryptocurrency, now infamous for its sudden, spectacular

implosion.  In the end, Mr. Wahi threw his life away for *nothing*.  Accordingly, regardless of the

later-discovered profits, as recognized by the PSR, a sentence of time-served is the right one for

Nikhil.

## IV.   A BALANCED CONSIDERATION OF ALL RELEVANT FACTORS UNDER 18 U.S.C. § 3553(a) DEMONSTRATES THAT A NON-CUSTODIAL SENTENCE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO ACHIEVE THE GOALS OF SENTENCING

18 U.S.C. § 3553(a) directs that a court "shall impose a sentence *sufficient*, *but not*

*greater than necessary*, to comply with the purposes set forth in paragraph (2) of this

subsection," which include:

> (A) to reflect the seriousness of the offense, to promote respect for
> the law, and to provide just punishment for the offense; (B) to afford
> adequate deterrence to criminal conduct; (C) to protect the public
> from further crimes of the defendant; and (D) to provide the
> defendant with needed educational or vocational training, medical
> care, or other correctional treatment in the most effective manner.[53]

In addition to considering each of these purposes, the Court also shall consider "the

nature and circumstances of the offense and the history and characteristics of the defendant" (18

U.S.C. § 3553(a)(1)), "the kinds of sentences available" (18 U.S.C. § 3553(a)(3)), "the kinds of

sentence and the sentencing range established" under the applicable Sentencing Guidelines (18

U.S.C. § 3553(a)(4)), and "the need to avoid unwarranted sentencing disparities among

defendants with similar records who have been found guilty of similar conduct" (18 U.S.C.

§ 3553(a)(6)).

---

[53] 18 U.S.C. § 3553(a)(2) (emphasis added).

Accordingly, the range calculated under the Guidelines is purely advisory and serves as just one of many factors that the Court is required to "consider" when fashioning an appropriate sentence.[54] "[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."[55] Indeed, "[e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the § 3553(a) sentencing factors."[56]

After thoroughly considering all the relevant factors, Nikhil respectfully submits that his case warrants a non-custodial sentence. As set forth below, such a sentence is consistent with sentences imposed on similarly situated defendants, takes account of the other circumstances of this case discussed herein, and is "sufficient, but not greater than necessary" to achieve the goals of criminal punishment under 18 U.S.C. § 3553(a).

### A.    A Non-Custodial Sentence Is Consistent with Sentences Imposed on Substantially Similar Defendants Convicted of Similar Conduct.

18 U.S.C. § 3553(a)(6) directs this Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."

Fraud cases in this District, as well as nationally, have *frequently* resulted in sentences substantially below the Guidelines range. The national average sentence in 2019 for fraud cases was 21 months, and in the S.D.N.Y., it was 19 months. The median sentences in both were 12

---

[54] *Crosby*, 397 F.3d at 113.

[55] *Rita v. United States*, 551 U.S. 338, 351 (2007).

[56] *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010).

months.  Significantly, 54.2% of fraud cases in the Second Circuit received a variance from the Guidelines at sentencing, and only 26.2% of fraud cases in the Second Circuit received a guideline sentence.[57]  In 2020, the national mean sentence in fraud cases was 19 months, and the median was 8 months; the Second Circuit mean was 19 months, and the median was 12 months.[58]  And in 2020, 59.2% of fraud cases in this Circuit received a downward variance.[59] In 2021, the national average sentence for fraud cases was 20 months, and in the S.D.N.Y., it was also 20 months.  The median sentence in both was 12 months.[60] In 2021, 66.3% of fraud cases in the S.D.N.Y received a downward variance.[61]

### B.   A Non-Custodial Sentence Will Be More Than Sufficient to Achieve the Goals of Specific and General Deterrence.

18 U.S.C. § 3553(a)(2) requires this Court also to consider the need to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant," which courts have interpreted to mean both specific and general deterrence.[62]

This case has already cost Nikhil dearly.  Primarily, he is going to face severe significant physical, emotional, developmental, and economic challenges due to his deportation.  He has already lost a very prestigious job, which represented the culmination of his successful American

---

[57] Exhibit C.

[58] Exhibit D.

[59] *Id.*

[60] Exhibit E.

[61] *Id*.

[62] *See Gupta*, 904 F. Supp. 2d at 352.

education and hard work.  Nikhil rightly worries about his future career prospects with this conviction in his past.

In addition, he knows the emotional and psychological toll his family has already been forced to endure.  Just a few months ago, his proud parents could boast about their son's success in America; shortly, he will return to India with his head hung in shame and the family name smeared across every tabloid and newspaper in New Delhi.  These are harms for which he will spend the rest of his life atoning.  Paradoxically, his motive for committing this crime was to improve the financial conditions of his parents, and it ended up putting them through the worst times of their lives.  He knows that, although he can never compensate for it, he can ensure that he never does anything again that can badly affect them.  Thus, there is no need for specific deterrence in this case, as Nikhil is extremely unlikely to be a repeat offender.

Statistics also show that Nikhil is highly unlikely to be a repeat offender.  Publications by the U.S. Sentencing Commission confirm that "first offenders" like Nikhil, with no prior convictions or arrests, have an "extremely low recidivism rate."[63]  The U.S. Sentencing Commission has also reported that defendants convicted of fraud-related crimes are less likely to recidivate than defendants convicted of any other crimes.[64]

---

[63] United States Sentencing Commission, *Recidivism And The "First Offender"* (May 2004), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/2004/200405_Recidivism_First_Offender.pdf at page 17 (reporting a 6.8% recidivism rate for true first time offenders). This study notably does *not* differentiate between different types of crime even though defendants convicted of fraud are the least likely to recidivate.

[64] United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (March 2016), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf at 20.

The Court must also consider the need for general deterrence when fashioning an appropriate punishment, and to this end, we point out the high-profile nature of this case. Almost every American newspaper, from the *Wall Street Journal* to *The New York Times*, every major global newspaper, and most 24-hour news outlets, including CNN, have reported on this case with great interest and detail.  As the first-ever "insider trading" criminal case in crypto-currency, every significant moment of this case has been reported exhaustively and in real-time. The global media has done this Court's job of deterring any would-be tipees of inside information regarding crypto-assets, and U.S. Attorney Damian Williams' sharp and clear press releases have extinguished any hypothetical appetite of the general public to mimic Nikhil's mistakes.[65]  Thus, we respectfully submit that the goals of general deterrence have already been achieved and that any prison time will not advance those goals.  Moreover, scholars have consistently concluded that it is the *certainty* of punishment, rather than its *severity*, that is the most effective deterrent for financial crimes.[66]

---

[65] https://www.justice.gov/usao-sdny/pr/tippee-pleads-guilty-first-ever-cryptocurrency-insider-trading-case.  "U.S. Attorney Damian Williams said: 'Less than two months after he was charged, Nikhil Wahi admitted in court today that he traded in crypto assets based on Coinbase's confidential business information to which he was not entitled.  For the first time ever, a defendant has admitted his guilt in an insider trading case involving the cryptocurrency markets.  Today's guilty plea should serve as a reminder to those who participate in the cryptocurrency markets that the Southern District of New York will continue to steadfastly police frauds of all stripes and will adapt as technology evolves.  Nikhil Wahi now awaits sentencing for his crime and must also forfeit his illicit profits.'"

[66] *See United States v. Velazquez*, No. 16-CR-233 (AKH), 2017 WL 2782037, *4 (S.D.N.Y. May 26, 2017) ("Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, 'increases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence.'") (citation omitted).  This is especially true with white-collar offenders.  *See*, Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment Purposes)*, 58 STAN. L. REV. 67, 80 (2005).  Thus, there is no empirical reason to believe that Nikhil's incarceration will provide more effective general deterrence.

### C.   A Period of Incarceration Will Impose Substantial Burden on Nikhil's Family in the Middle of a Global Pandemic

Even before the Supreme Court's ruling in *United States v. Booker*[67] clarified that the Sentencing Guidelines are only advisory, the Second Circuit held that "extraordinary family circumstances" were a valid basis for granting a downward departure from the Sentencing Guidelines.[68]  Post-*Booker*, the Second Circuit has continued to recognize that courts should consider the burden a sentence will impose on innocent family members when fashioning an appropriate sentence.[69]  Consistent with this guidance, judges within the Southern District have repeatedly issued sentences well below the Guidelines range in comparable cases based, in part, on determinations that lengthy incarcerations would place significant burdens on the defendant's family members.

For example, in *United States v. Blaszczak*, Judge Kaplan recently imposed a sentence well below the Guidelines range on an insider trading defendant who was convicted after trial based upon the burden that lengthy incarceration would impose on his wife and child.  The facts were as follows: For six years, David Blaszczak sold inside information to hedge fund clients that they used to realize over $7 million dollars in gains.[70]  Blaszczak was paid more than

---

[67] 543 U.S. 220 (2005).

[68] *See United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992).

[69] *See*, *e.g.*, *United States v. Isola*, 548 Fed. Appx 723, 725 (2d Cir. 2013) (identifying "[defendant's] family circumstances and the effects of his incarceration on his daughter" as one of the factors to be considered under 18 U.S.C. § 3553(a)); *United States v. Bills*, 401 Fed. Appx 622, 624 (2d Cir. 2010) (holding that "the likely effects of [defendant's] incarceration on her daughter" were one of the "mitigating factors" that was appropriately considered under 18 U.S.C. § 3553(a)).

[70] Exhibit F at 2–3.

$700,000 for that information.[71]   Judge Kaplan determined that Blaszczak had "aggressively" pursued sources of inside information that he could sell and was "bold, unapologetic, and giddy about what he was doing."[72]   Under the Sentencing Guidelines, Judge Kaplan calculated an offense level of 26, resulting in a sentencing range of 63–78 months.[73]   And yet, Judge Kaplan sentenced Blaszczak to only twelve months and one day in jail, plus two years of supervised release.[74]   The sole reason offered on the record for this substantial deviation from the Guidelines was that Blaszczak's wife, who had a degenerative eye disease, and child would be severely burdened by his absence.   Judge Kaplan stated, "The wreckage that a long period of incarceration would wreak on her and on your son is horrifying to me.   And the sentence I am going to impose on you is going to reflect that."[75]

Nikhil resides with his brother, co-defendant Ishan Wahi, in Seattle.   As noted above, Nikhil provides financial support for his brother, who was laid off from his position as a Product Manager at Coinbase following his arrest for the instant offense.   As previously stated, Nikhil's parents have already spent an extraordinary amount on his education and legal fees, which created a massive dent in their retirement savings.   Nikhil's entire family, except for his brother and him, lives in India; now that both brothers have lost their jobs, they cannot help support their family in India, and worse, their family in India must help to support them.   There can be no doubt that a custodial sentence would impose an enormous burden on his family.   We submit that

---

[71] *Id*. at 9.

[72] Exhibit G at 62:15–24.

[73] *Id.* at 22:19–23:1.

[74] *Id.* at 72:6–13.

[75] *Id.* at 70:19–22.

a non-custodial sentence would mitigate the risks to his family while satisfying the requirements of Section 3553(a).

> **D.** **A Non-Custodial Sentence Serves the Interests of the Federal Prison System and Is Fair to Nikhil.**

> 1. COVID-19

If the Court imposes a further custodial sentence, the infamous U.S. Bureau of Prisons' COVID-19 conditions await him. These are very difficult facilities for anyone, especially non-violent financial crime offenders. But with the onset of COVID-19, the terms of Nikhil's confinement would be brutally harsh. Despite the efforts of governments, citizens, and science, COVID-19 is still with us, wreaking havoc and endangering people, and silently mutating to keep one step ahead. As Judge Gardephe noted while sentencing Michael Avenatti, "Conditions were terrible. Hard to believe they could occur in the United States."[76] The Honorable Paul Oetken has stated that confinement during COVID-19 should count for up to twice the length of the incarceration.[77]

In the words of former Chief Judge McMahon while sentencing an in-custody defendant who had been incarcerated during COVID:

> [The] MCC and the MDC, two federal correctional facilities located in the City of New York that are run by morons, which wardens cycle (through) repeatedly, never staying for longer than a few months or even a year. So there is no continuity, there is no leadership, there is no ability to get anything done. They lurch from crisis to crisis, from the gun smuggling to Jeffrey Epstein, none of which is the fault of [the defendant] or any of the other inmates I have sentenced or will sentence.

> It is the finding of this Court that the conditions to which she was subjected are as disgusting, inhuman as anything I've heard about

---

[76] Exhibit H.

[77] *Id.*

(in) any Colombian prison, but more so because we're supposed to be better than that. . . . The fact that you haven't been out for a year is a result of the pandemic.  Nobody's been out for a year.  Nobody's had visitors.  People have gotten locked up all over the country in the SHU when they've gotten sick, and you had the great misfortune to not only to get COVID but to get COVID in the earliest days, when we didn't know what we were doing.  And that being so, I think you've suffered triply as a result.

But there is no excuse for the conditions in those two institutions.  There is no excuse for the serial leadership that does not allow the office of warden to take control and get control of those facilities, that they just cycle through, most of them at the end of their careers, and it is unfair and unjust.  You shouldn't have to suffer for the incompetence of the United States Department of Justice and its subsidiary agency, the Bureau of Prisons.[78]

Recognizing that COVID-19 requires sentencing courts to take the brutal conditions of confinement into consideration, countless federal courts have affirmatively granted downward variances based on COVID-19.  We attach here a chart of such sentences.[79]

Giving Nikhil a non-custodial sentence also serves two other important interests.  First, not imposing a custodial sentence on Nikhil will greatly reduce his risk of contracting coronavirus, which has spread widely in the federal prison system, where (as of December 23, 2022) 55,310 prisoners have tested positive, and 309 have died.[80]

---

[78] Judge Colleen McMahon, "*In Her Own Words: Federal Judge Slams 'Morons' Running NYC Jails*", NY Daily News, May 7, 2021, available at: https://www.nydailynews.com/new-york/ny-judge-mcc-mdc-20210507-nhcuujw6kjbmnm7qjus5pfrpdm-story.html.

[79] Exhibit I.

[80] Federal Bureau of Prisons COVID-19 Resource Page, available at https://www.bop.gov/coronavirus/index.jsp.

Second, both courts and the Attorney General of the United States have acknowledged that reducing the population inside crowded BOP facilities will reduce the spread of the virus.[81] Along those lines, on March 26, 2020, the Attorney General of the United States issued a directive to the Bureau of Prisons stating that "[o]ne of the BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances."[82]  The Attorney General directed the BOP to consider releasing "inmates who are non-violent and pose minimal likelihood of recidivism" to home confinement and listed several factors to consider, including the CDC health risk factors of the inmate, whether the inmate was in a low-security facility, the inmate's conduct in prison, the inmates score on BOP's recidivism scoring system, whether the inmate has a verifiable reentry plan (including a stable place to serve home confinement), and the inmate's crime of conviction.[83]  On April 3, 2020, the Attorney General issued another directive, making the finding under the CARES Act that BOP faces "emergency conditions," thereby granting BOP statutory authority to expand the group of inmates who could be considered for home confinement.[84]  The Attorney General further directed that "time is of the essence" and that eligible inmates should be transferred home immediately if they can successfully quarantine at

---

[81] *See United States v. Nkanga*, 18-CR-713 (JMF), 2020 WL 1529535, *1 (S.D.N.Y. Mar. 31, 2020), *reconsideration denied*, 18-CR-713 (JMF), 2020 WL 1695417 (S.D.N.Y. Apr. 7, 2020) (Judge Furman stating that "the best—perhaps the only—way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible").

[82] Exhibit J.

[83] *Id.*

[84] Exhibit K.

home and even if electronic monitoring was not currently available.[85]  Pursuant to these directives, the BOP has significantly increased its placement of offenders on home confinement.[86]

In addition, hundreds of others have been granted compassionate release either by courts or by the BOP.  Many of those being released have served only a fraction of their sentence, including, for example, Michael Cohen, who was 53 and was released to home confinement for the remainder of his three-year sentence after serving only one year;[87] Paul Manafort, who was released to home confinement after serving only three of his seven-year sentence;[88] a former mayor who was sentenced to 20 years for bribery but was released to home confinement after only eight years;[89] and a 51-year-old CEO released to home confinement after serving only 4 years of his 7.5-year sentence for tax evasion.[90]

---

[85] *Id.*

[86] *Id.* Currently, the BOP has 6,320 inmates on home confinement.  The total number of inmates placed in home confinement from March 26, 2020, to the present (including inmates who have completed service of their sentence) is 51,433.

[87] Gurman, Sadie, Trump's Lawyer Michael Cohen Released To Home Confinement, *The Wall Street Journal*, (May 21, 2020) *available at* https://www.wsj.com/articles/trumps-former-lawyer-michael-cohen-released-to-home-confinement-11590075443.

[88] Faulders, Katherine, Former Trump Campaign Chairman Paul Manafort Released to Home Confinement Amid Coronavirus Concerns, ABC News, (May 13, 2020) *available at* https://abcnews.go.com/Health/trump-campaign-chairman-paul-manafort-released-home-confinement/story?id=70642927.

[89] *Former St. Gabriel mayor released early from federal prison*, WAFB9, (May 28, 2020) *available at* https://www.wafb.com/2020/05/28/former-st-gabriel-mayor-released-early-federal-prison/.

[90] Killman, Curtis, *Former Arrow Trucking CEO released from prison to go to home confinement*, Tulsa World, (May 7, 2020), *available at* https://www.tulsaworld.com/news/local/crime-and-courts/former-arrow-trucking-ceo-released-from-prison-to-go-to-home-confinement/article_e51e30a4-2f4f-5f24-9a4e-9280ae9d5cc8.html.

2.   Additional Public Interest Considerations

Considering the cost in today's dollars of approximately $44,258[91] per year, imprisoning Nikhil makes no sense at all—Nikhil will remain a financial burden throughout his incarceration and lose significant time in which he could have been working toward rebuilding his life.  Such expenditures of taxpayer money should be reserved for only the most dangerous and incorrigible offenders.  Nikhil is neither dangerous nor incorrigible.  Barring this incident, he has demonstrated over the course of his life that he is law-abiding, family-oriented, and peaceful—he does not need an additional custodial sentence to deter him.

We submit that under these circumstances, a non-custodial sentence serves the ends of punishment, is consistent with BOP's current efforts to reduce the prison population, especially with respect to non-violent offenders who present a low risk of recidivism, and serves the public interest.

V.   **CONCLUSION**

Nikhil is an exceptional son and a good young man who has already been punished extensively as a result of the sins of his past.  To use his mother's words, he should be "shown mercy, compassion and be given an opportunity to continue to make a positive contribution to the society."[92]  Further, it is an absolute certainty that shortly after this Court pronounces its sentence, Nikhil's life sentence of deportation—and permanent exile from the country he

---

[91] *See* PSR at ¶99.  This cost does not account for inflation.  Nor does it include the cost of any medical care that Nikhil might require due to COVID-19 or other medical issues.

[92] *See* Exhibit A-1 - Letter by Kavita Wahi.

loves—will begin.  Accordingly, we respectfully request that the Court impose a non-custodial sentence on Nikhil Wahi.

Dated: December 27, 2022

Respectfully submitted,

CHAUDHRYLAW PLLC

By: */s/Priya Chaudhry*
Priya Chaudhry

147 West 25th Street, 12th Floor
New York, New York 10001
priya@chaudhrylaw.com
Tel.: (212) 785-5550
Fax: (212) 898-9040

*Attorneys for Defendant*
*Nikhil Wahi*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 27th day of December 2022, I electronically filed this Sentencing Memorandum on behalf of Nikhil Wahi, and the exhibits annexed thereto, using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Priya Chaudhry*
Priya Chaudhry

*Attorney for Defendant Nikhil Wahi*