UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                             :
UNITED STATES OF AMERICA                     :
                                             :          22 Cr. 392 (LAP)
          -  v.  -                           :
                                             :
NIKHIL WAHI,                                 :
                                             :
                        Defendant.           :
                                             :
-------------------------------------------------------x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


                                   DAMIAN WILLIAMS
                                   United States Attorney
                                   Southern District of New York


Noah Solowiejczyk
Nicolas Roos
Assistant United States Attorneys
        - *Of Counsel* -

## PRELIMINARY STATEMENT

The Government respectfully submits this sentencing memorandum in advance of the sentencing of Nikhil Wahi scheduled for January 10, 2023.

For a period of approximately ten months, the defendant profited from misappropriated confidential business information provided to him by his brother, Ishan Wahi, a product manager at Coinbase Global Inc. ("Coinbase"), regarding which crypto tokens Coinbase planned to list on its exchanges.   Using this Coinbase confidential business information, the defendant profitably traded in numerous crypto tokens prior to Coinbase's listing announcements.   The defendant did not trade based on this pilfered Coinbase confidential business information in a few isolated instances.   This crime was not the result of an isolated error in judgment.   Rather, the defendant participated in a long-running criminal scheme and chose to trade based on stolen Coinbase confidential information time and time again.   In total, the defendant traded in at least 40 different crypto tokens and generated nearly $900,000 in profits based on Coinbase confidential business information provided to him by his brother.   The defendant then moved these proceeds through a series of anonymous Ethereum wallets and accounts held at centralized crypto exchanges under pseudonyms and dummy email accounts.

In light of the seriousness of the offense conduct, the goals of sentencing – particularly just punishment, promotion of respect for the law, and adequate deterrence – will be served by a term of imprisonment between 10 and 16 months' imprisonment.[1]   Such a sentence is sufficient but not greater than necessary to serve the legitimate ends of sentencing.

---

[1] As is discussed in further detail below, the Government learned of additional trading and profits earned by the defendant subsequent to his September 12, 2022 guilty plea.   The plea agreement entered into between the Government and the defendant contains a stipulated Guidelines range of 10 to 16 months' imprisonment based on a gain amount between $40,000 and $95,000. Consistent with its obligations under the plea agreement, the Government recommends a sentence

## STATEMENT OF FACTS

From in or about July 2021 through in or about April 2022, co-defendant Ishan Wahi tipped his brother, the defendant, regarding which crypto assets Coinbase was planning to list and the timing of public announcements of those listings. Ishan Wahi – a product manager at Coinbase – tipped the defendant so that the defendant could make well-timed purchases of crypto assets in advance of Coinbase's listing announcements.  (PSR ¶ 13).   After Coinbase's listing decisions became public, and after the crypto assets appreciated due to that announcement, the defendant caused the sale of those crypto assets for substantial profits.  (PSR ¶ 15).   The Government's investigation to date has revealed that the defendant, in total, traded in over 40 different crypto assets based on confidential information regarding impending Coinbase listing announcements provided to him by Ishan Wahi. The defendant generated total profits of nearly $900,000 from this trading.[2]

*Background on Coinbase and Coinbase Listing Announcements*

Coinbase is one of the largest cryptocurrency exchanges in the world.   Coinbase allows users to acquire, exchange, and sell various crypto assets in online user accounts.   In order to transact in a particular crypto asset on Coinbase, that crypto asset must be listed on Coinbase's exchanges.   Coinbase frequently announces that particular crypto assets will be listed on one of its exchanges or are under consideration for listing.   Coinbase often makes these announcements on Coinbase's publicly available blog or Twitter account.   It is well known to market participants

---

within this Stipulated Guidelines range despite the fact that the Government has since learned that the profits earned by the defendant were actually approximately $892,500.

[2] The statement of facts is based on the facts contained in the PSR, the allegations in the Indictment, as well as information that the Government learned subsequent to the filing of the Indictment and the defendant's guilty plea.   The information learned by the Government subsequent to the defendant's guilty plea is contained in an affidavit filed in support of the issuance of seizure warrants pursuant to 18 U.S.C. § 981 and 984 (the "Seizure Affidavit").   A copy of the Seizure Affidavit is annexed hereto as Exhibit A.

that after Coinbase announces that it is going to be listing or is considering listing a particular crypto asset, the market value of that crypto asset typically rises substantially.   (PSR ¶ 17).

Coinbase takes steps to guard the confidentiality of information regarding prospective asset listings and to ensure that potential traders do not learn of prospective listings before the company announced them formally to the general public. The company's policies and agreements thus prohibit employees from using confidential information about asset listings, including which crypto assets Coinbase intends to list on its exchanges, except for the benefit of Coinbase.   Indeed, Coinbase's policies make clear that employees "helping to implement support of [a] new asset" are prohibited from "buy[ing] the new asset" in advance of an announcement.   Coinbase's written policies also prohibit employees from disclosing the confidential information to any person outside of Coinbase, including "family or friends," and expressly bar employees from providing a "tip" to any person who might make a trading decision based on the information.   (PSR ¶ 18).

*Ishan Wahi's Role at Coinbase*

Beginning in October 2020, the defendant's brother, Ishan Wahi, was employed by Coinbase as a product manager assigned to an asset listing team.   Pursuant to the policies described above, and by virtue of his employment more generally, Ishan Wahi was prohibited from sharing confidential business information about Coinbase's asset listings with others and from using that information other than for the benefit of his employer.   Moreover, as a member of Coinbase's asset listing team, Ishan Wahi was subject to an "enhanced trading policy" that, among other things, required him to report his digital asset holdings and seek preclearance for any digital asset trades conducted by Ishan Wahi outside of Coinbase's platform.   During the course of his employment at Coinbase, Ishan Wahi provided Coinbase with a written certification that he had read the company's trading and confidentiality policies, that he understood them, and that he would comply with them.   (PSR ¶ 19).

3

As a product manager on one of Coinbase's asset listing teams, Ishan Wahi frequently had advance knowledge of which crypto assets Coinbase planned to announce it was listing or considering listing, and had advanced knowledge of the timing of those announcements.   Indeed, beginning at least in or about August 2021 and continuing until at least in or about May 2022, Ishan Wahi was a member of a private messaging channel reserved for a small number of Coinbase employees with direct involvement in the Coinbase asset listing process.   Upon joining the channel, Ishan Wahi was informed by another Coinbase employee that its purpose was to provide a "safe place to discuss details around asset launches" such as "exact announcement / launch dates + timelines" that the company did not wish to share with all of its employees.   (PSR ¶ 20).

Ishan Wahi sought to deceive Coinbase and his fellow employees by assuring them – through, among other means, Coinbase's private asset listing messaging channel – that he was maintaining the confidentiality of this information.   In truth and in fact, however, Ishan Wahi repeatedly breached his duty of confidentiality to Coinbase by misappropriating Coinbase's confidential information and providing it to (1) his brother, the defendant, and (2) Ishan Wahi's friend and associate, Sameer Ramani ("Ramani"), so that they could each make profitable trades on the basis of that confidential information.   (PSR ¶ 21).

*Nikhil Wahi's Extensive Trading Based on Coinbase Confidential Information*

The defendant traded extensively based on the Coinbase confidential business information provided to him by his brother.   Based on the Government's investigation it appears that the defendant first traded on Coinbase confidential information as early as July 2021.   Between that date and at least approximately April 2022, the defendant purchased at least approximately 40 different crypto assets shortly before Coinbase announced it would be listing these crypto assets on its exchanges, and then subsequently sold these assets for substantial profits.

The defendant's initial trades were for modest sums.   But, over time, the principal that the defendant used to purchase the crypto assets based on misappropriated information and the profits that he realized from selling them escalated substantially.   For example, whereas in August 2021 the defendant purchased approximately $60,000 worth of the crypto asset TRIBE prior to the Coinbase listing announcement, and sold these TRIBE tokens for a profit of approximately $7,000 shortly after the Coinbase listing announcement (PSR ¶¶ 23-24), by the spring of 2022 the defendant was regularly putting up hundreds of thousands of dollars in principal to purchase crypto assets and then selling these assets after Coinbase listing announcements for tens of thousands of dollars in profits. (*See* Seizure Affidavit ¶¶ 28(f)-(h); 30(c)(xv)-(xviii).

*The Defendant's Efforts to Avoid Detection*

The defendant and his co-conspirators also took numerous steps to evade detection from law enforcement.   Throughout the scheme, the defendant attempted to conceal his trading by transferring his crypto assets through a web of crypto accounts and anonymous Ethereum blockchain wallets, including through accounts registered in the names of other nominal owners and under pseudonym email accounts.   (PSR ¶ 16).   Frequently, the anonymous Ethereum wallets that the defendant used to place his trades and move proceeds had no prior balances or transactional history.   (*See, e.g.,* Seizure Affidavit ¶¶ 24 n.13, 25 n.14, 32(d)).   Certain wallets were used purely as passthrough accounts to move proceeds from one wallet or account to another. (*Id.* ¶ 27).

As a result of the Government's ongoing investigation following the defendant's guilty plea, the Government identified an extensive network of anonymous Ethereum wallets and

multiple accounts held under false names and pseudonym email accounts[3] that the defendant used to buy and sell crypto assets and to then funnel the proceeds to other accounts and wallets.   This network of anonymous Ethereum wallets and centralized crypto exchange accounts utilized by the defendant is depicted graphically in Exhibit B of the Seizure Affidavit (*see* page 72 of the Seizure Affidavit). Even this graphical depiction does not capture the full scope of anonymous Ethereum wallets and centralized accounts used by the defendant in connection with the scheme.

The Government's post-plea investigation further revealed that the defendant coordinated with other co-conspirators to move his proceeds.   In particular, Whatsapp chat messages obtained from the cellular phone of the defendant pursuant to a judicially authorized search and seizure warrant[4] further revealed that the defendant coordinated with co-defendant Sameer Ramani – who also had traded extensively based on misappropriated Coinbase confidential business information provided by Ishan Wahi – in order to move proceeds of the scheme between accounts that the defendant controlled.   (Seizure Affidavit ¶ 25-27).

The defendant moved a portion of the illegal proceeds using a Binance account that was opened in the name of a nominee owner.   This Binance account was opened under the name of

---

[3] The defendant used three accounts at centralized exchanges to generate the vast majority of his profits from the scheme.   One account was held at the cryptocurrency exchange Binance under a pseudonym email address.   (Seizure Affidavit ¶¶ 21-22).   The second account was also opened with Binance using a pseudonym email address, but the name associated with the account was Nikhil Wahi, and the defendant provided a photograph of himself as part of the account opening process.   (Seizure Affidavit ¶¶ 29-30).   Third, and finally, the defendant also extensively utilized an account he controlled at the offshore cryptocurrency exchange Kucoin.   This account was opened using a pseudonym email address and no identification documents or legal name was associated with the account.   (Seizure Affidavit ¶¶ 28).

[4] While the Government obtained the warrant on May 26, 2022 and executed the warrant shortly thereafter, the FBI did not have the password to the defendant's cellular device.   The FBI eventually gained partial access to the device such that it was able to extract the relevant Whatsapp messages, but the FBI case team gained access to the extraction report only after the defendant had already pleaded guilty.   A full copy of the data extracted from the defendant's device was provided to defense counsel in advance of sentencing.

another individual using an identification card issued by the Indian government.  (Seizure Affidavit ¶ 24(b) & n.12).   The account had no prior account balance prior to receiving the proceeds of the insider trading scheme.   (Seizure Affidavit ¶ 24(c)).

> *Ishan Wahi's Attempt to Flee the United States and the Defendant's Movement of Proceeds Immediately Following Ishan Wahi's Arrest*

On April 28, 2022, Coinbase's Chief Executive Officer posted on the company's publicly accessible blog that the company was investigating whether "someone inside Coinbase" leaked the company's confidential information "to outsiders engaging in illegal activity," and that any Coinbase employee who engaged in such activity would be "immediately terminated and referred to relevant authorities (potentially for criminal prosecution)."  (PSR ¶ 33).   On May 11, 2022, the company's director of security operations emailed Ishan Wahi to inform him that he should appear for an in-person meeting relating to Coinbase's asset listing process at Coinbase's Seattle, Washington office on May 16, 2022.   Ishan Wahi confirmed he would attend the meeting.   (*Id.*)

After learning that he was going to be interviewed as part of Coinbase's investigation, Ishan Wahi attempted leave the United States and flee to India.   In particular, on the evening of Sunday May 15, 2022, the night before his meeting with Coinbase was scheduled to occur, Ishan Wahi purchased a one-way ticket for a flight to New Delhi, India that was scheduled to depart in approximately 11 hours, shortly before Ishan Wahi was supposed to be interviewed by Coinbase. (PSR ¶ 34).   In the hours between booking the flight and his scheduled departure time on May 16, 2022, Ishan Wahi separately called and texted the defendant and his other co-defendant, Sameer Ramani, about Coinbase's investigation and sent the defendant a photograph of the messages he (Ishan Wahi) had received on May 11, 2022 from Coinbase's director of security operations. (PSR ¶ 35).   Prior to boarding his May 16, 2022 flight to India, Ishan Wahi was stopped by law enforcement and arrested on a material witness warrant.   On his way to board his one-way flight,

Ishan Wahi had with him an extensive array of his belongings, including, among other items, three large suitcases, seven electronic devices, two passports, multiple other forms of identification, hundreds of dollars in U.S. currency, financial documents, and other personal effects and items. (PSR ¶ 36).

On May 16, 2022 – the same day that Ishan Wahi tried to board a flight but was, instead, detained – Nikhil Wahi moved approximately $338,000 worth of the proceeds of his illegal trading from two accounts he controlled at centralized exchanges to an unhosted and anonymous Ethereum wallet that Nikhil Wahi also controlled. (Seizure Affidavit ¶ 32(d)-(e)).   The wallet had no balance prior to receiving these deposits.   (*Id.*)

## PROCEDURAL HISTORY

On July 19, 2022, the defendant was charged in Indictment 22 Cr. 392 with one count of wire fraud conspiracy (Count One) and one count of wire fraud (Count Three) for his role in the above-described scheme.   On July 21, 2022, the defendant and his co-defendant Ishan Wahi were arrested in the Western District of Washington and ordered released on bail conditions. Defendant Sameer Ramani remains at large.

On September 12, 2022, the defendant pleaded guilty pursuant to a plea agreement with the Government to Count One of the Indictment.   The stipulated Guidelines range within the plea agreement was based on the trading profits that the Government had identified from its investigation at the time of the plea.   As of the date of the plea, the Government had determined that the defendant generated approximately $54,100 in profits from this trading activity. Accordingly, the plea agreement reflects a Stipulated Guidelines range of 10 to 16 months'

imprisonment based on a Criminal History Category of I and a total offense level of 12.   (PSR ¶ 7).[5]

    As of the September 12 plea, the Government had seized the cellular device of the defendant pursuant to a judicially authorized search warrant. The FBI did not have a password to the device and the FBI case team gained access to a partial extraction report of the defendant's cellular device only after the defendant had already pleaded guilty.   Subsequent to the defendant's plea, the FBI identified certain Whatsapp messages between the defendant and co-defendant Sameer Ramani regarding the movement of funds between cryptocurrency wallets, as is described above.   After identifying these chat messages relating to the movement of proceeds, through further investigation the Government discovered that the defendant had, in fact, traded in many more crypto tokens based on Coinbase confidential business information than the Government's investigation had initially revealed.   This additional trading occurred through the various accounts at cryptocurrency exchanges the defendant controlled that are described above.   While at the time of the plea the Government had calculated a gain amount of approximately $54,100 based on trading in less than 10 crypto tokens, the Government's additional investigation revealed that the defendant had, in fact, traded in at least a total of 40 different crypto tokens and generated gains of at least approximately $892,500.[6]

---

[5] The total offense level was calculated based on a base offense level of eight pursuant to U.S.S.G. § 2B1.4(a), a six-level enhancement resulting from a gain between $40,000 and $95,000 pursuant to U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(D), and a two-point reduction pursuant to U.S.S.G. § 3E1.1(a), assuming the defendant clearly demonstrates acceptance of responsibility prior to the imposition of sentence.   (PSR ¶ 7).   A copy of the plea agreement is annexed to this submission as Exhibit B.

[6] The details of this trading activity and the profits it generated, as well as the extensive array of accounts and wallets the defendant utilized to move the proceeds, are set forth in detail in the Seizure Affidavit, which is annexed to this submission as Exhibit A.

The Government's additional investigation resulted in the identification of nearly $700,000 in proceeds of the scheme that still remained in an Ethereum wallet and in a Kucoin account controlled by the defendant.   On November 28, 2022, Magistrate Judge Stewart Aaron issued seizure warrants based on the Seizure Affidavit, which permitted the Government to seize the 324,165.60 USDC stablecoins contained in the Ethereum wallet and the contents of the Kucoin account that the defendant controlled.[7]

The U.S. Probation Office calculated an identical Guidelines range to the Guidelines range in the plea agreement based on a gain amount of $54,100. (PSR ¶¶ 45-54, 89).   The Government provided the Probation Office with information regarding additional trading profits of approximately $820,000 prior to its issuing the final PSR, but this information does not appear to have been taken into account when the Probation Office calculated the applicable Guidelines range.   (PSR ¶ 39).   With respect to the Guidelines Range, the Government will abide by the terms of the plea agreement.   As is provided in the plea agreement:

> It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the [Stipulated Guidelines Range], either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts. In the event that the Probation Office of the Court contemplates any Guidelines adjustments, departures, or calculations different from [the Stipulated Guidelines Range], or contemplates any sentence outside of the [Stipulated Guidelines Range], the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

(Exhibit B, at 3); *see generally United States v. Gordon*, No. 18 Cr. 373 (RJS), 2020 WL 529301 (S.D.N.Y. Feb. 3, 2020).

---

[7] Counsel for the defendant provided screenshots obtained by the defendant showing that the Kucoin account presently contains approximately $370,827 worth of crypto assets.

## DISCUSSION

In light of the lengthy and protracted nature of his offense, the sophistication and deception inherent in the crime, and the defendant's personal history and characteristics, a term of imprisonment between 10 and 16 months is necessary to meet the statutory ends of sentencing, including just punishment, deterrence, and promoting respect for the law.  The defendant's request of time served would not adequately reflect the seriousness and wrongfulness of the defendant's conduct and would be contrary to the sentencing goals of 18 U.S.C. § 3553.

Because this sentencing represents the first involving insider trading in crypto assets, a sentence of time served would also undermine the goal of general deterrence.  The defendant's proposed sentence would send the wrong message to those who work in the cryptocurrency industry and regularly have access to confidential business information that misappropriating and using such information for personal profit is not a serious offense and will not be met with serious punishment.  By contrast, a sentence between 10 and 16 months' imprisonment will send a clear signal to the cryptocurrency community that insider trading in crypto assets will result in the same serious consequences as insider trading in the equity markets – a signal necessary to send, lest would-be fraudsters and manipulative traders believe that they can get away with the same abusive conduct simply by applying the same criminal techniques to trading in cryptocurrencies rather than securities.

*Nature and Circumstances of the Offense and the Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment*

The defendant engaged in a protracted course of illegal conduct over a period that spanned approximately 10 months. During that time period, he was repeatedly tipped by his brother, who occupied a trusted position at Coinbase and had routine access to information regarding which crypto tokens would be listed on Coinbase's exchanges and the timing surrounding Coinbase's listing announcements.  Such information was highly valuable and Coinbase had policies and

11

safeguards in place to prevent this information from getting in the wrong hands. The defendant then used this information to trade for his own profit over and over again in at least 40 different crypto assets, generating approximately $892,500 in profits.

The defendant's conduct stands in stark contrast to many insider trading cases prosecuted in this District. Frequently, such prosecutions involve trading around a single corporate announcement or, in some instances, a handful of announcements.  Here, instead, the defendant chose to trade again and again, and his trading only escalated over time.  As the scheme was reaching its conclusion in March and April of 2022, the defendant began using larger and larger sums of principal to maximize his potential profits.   In March and April 2022 alone, the defendant used total principal of over $2.25 million to purchase various crypto assets shortly before Coinbase's listing announcements, and then sold these assets shortly after Coinbase listing announcements for over $150,000 in profits. (Seizure Affidavit ¶ 30(c)(xiv)-(xviii); ¶ 28(f)-(h)).

Finally, it bears noting that the defendant also engaged in extensive and sophisticated efforts to conceal his activities.   He used a network of anonymous Ethereum wallets and accounts held under pseudonym email addresses to place the trades and move his proceeds in an effort to escape detection and prolong his scheme.   The defendant frequently created new wallets with no prior transaction history to place his illicit trades and to move proceeds of the scheme.   These efforts even involved utilizing a Binance account that was held in the name of another individual and opened using Indian government identification documents in order to move proceeds of the scheme. Such steps made the trading activity exceedingly difficult for law enforcement to track and trace.   These deliberate steps further show that the defendant's actions were not some momentary lapse or fleeting mistake, they were part of a conscious and deliberate plan.   The defendant fully understood the wrongfulness of his conduct and took every precaution to evade detection.   The sentence meted out by this Court should take all of this conduct into account.

*General Deterrence*

A sentence within the range of 10 to 16 months' imprisonment is also necessary in this case to afford adequate deterrence to criminal conduct.   *See* 18 U.S.C. § 3553(a)(2)(B).

The defendant stands before the Court as the first defendant convicted of trading in crypto assets based on confidential business information provided by a tipper.   In applying the section 3553(a) factors, this Court should carefully consider how the sentence it imposes will serve as an example to others who may be tempted to engage in insider trading in the cryptocurrency markets. The temptation to engage in such conduct is just as real in the crypto markets as it is in the equity markets.   Each and every time any major cryptocurrency exchange intends to list a crypto token on its exchanges – which is a regular occurrence on these cryptocurrency exchanges – there are typically numerous employees of these exchanges and others who are part of the development team for the relevant crypto tokens who possess advanced knowledge of the planned listing.   Such listings frequently impact the price of the relevant crypto tokens.   By imposing a sentence within the range proposed by the Government, this Court will send a clear and unequivocal message to those tempted to engage in insider trading in crypto assets that such conduct will be treated just as this conduct is treated in the equity markets, and that those who cross the line can be assured they will likely face jail time.   When crimes like this one are uncovered and successfully prosecuted, it is critical that they serve as examples to other insider trading criminals and would-be criminals. Here, the imposition of a term of incarceration is critical to that end.   It is that element of punishment that is necessary to effectively prevent people from engaging in such crime in the first place.

Deterrence is additionally of particular import in this case because the sophistication of the scheme makes crimes such as these particularly difficult to detect and prosecute.   Indeed, while traditional insider trading in the equity markets is in and of itself a difficult crime to detect and

prosecute, when this conduct occurs in the crypto markets it is even more difficult to uncover and prosecute. This is due to the fact that those who choose to engage in insider trading in crypto assets can easily conceal their involvement including by, among other things, making use of anonymous Ethereum wallets that have no actual link to their identity, using various forms of technology to conceal their true internet protocol ("IP") addresses, and opening accounts at various offshore cryptocurrency exchanges without providing any identity documentation. Accordingly, deterring the already difficult to detect crime of insider trading is particularly necessary in the context of the crypto markets, where uncovering and prosecuting such crimes is even more challenging for law enforcement. *See United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."); *see also United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (citing *Heffernan*).

*The Defendant's Submission Does Not Provide Any Compelling Rationale for Time Served*

The defendant raises a number of arguments in his sentencing submission in support of his request for a sentence of time served. This Court should reject that proposed sentence as inadequate to vindicate all of the relevant section 3553(a) factors.

Unwarranted Sentencing Disparities

The defendant argues, among other things, that his recommendation of time served is necessary to avoid unwarranted sentencing disparities. (Def. Memo at 24-25) (citing 18 U.S.C. §

3553(a)(6)).   Here, imposing a sentence within the range proposed by the Government would not result in any unwarranted sentencing disparities.   As is described above, the defendant engaged in a systematic pattern of insider trading in numerous crypto assets and took elaborate steps to conceal that conduct.   Those circumstances warrant penal consequences.   Tippees like the defendant have received frequently incarceratory sentences.   For example, in *United States v. Dov Malnik*, 19 Cr. 714 (VM), the defendant traded based on MNPI in multiple companies and earned over $2 million in illegal profits from his participation in the scheme.   Following the defendant's guilty plea, Judge Marrero imposed a sentence of 30 months' imprisonment and, in explaining his rationale for his sentence, specifically noted that Malnik had not engaged in "just occasional insider trading for small profits" but rather the conduct "went on with multiple securities over the course of many years."   *See Malnik*, 19 Cr. 714, Dkt. No. 33 (11/19/21 Sentencing Tr.), at 20. Notably, in that case, the Probation Office had recommended a sentence of time served but Judge Marrero nevertheless imposed a 30-month sentence, which was slightly below the Guidelines range of 37 to 46 months.   *Id.* at 19-20.[8]   Similarly, in *United States v. Millul*, 18 Cr. 579 (JSR), the defendant, who pleaded guilty, was a tippee who the Government estimated had made slightly over $100,000 in insider trading profits.   *United States v. Millul*, 18 Cr. 579 (JSR), Dkt. No. 149 at 13.   The Probation Office there recommended a sentence of time served and the defendant's Guidelines range was 12 to 18 months' imprisonment. *Id.* at 9.   Judge Rakoff ultimately imposed a sentence of five months' imprisonment.   *Millul*, 18 Cr. 579 (JSR), Dkt. No. 152.   Millul, unlike the defendant before this Court, had not engaged in an extensive pattern of insider trading and had made far less profits than the defendant.

---

[8] While Malnik was certainly a more sophisticated and culpable actor than the defendant, the term of imprisonment that the Government seeks in this case is, accordingly, substantially lower than the sentence that was imposed on Malnik.

In sum, the sentence proposed by the Government would not result in any sentencing disparities whatsoever when assessed against other recent sentences imposed in this District.   On the other hand, the sentence of time served proposed by the defendant – despite the extensive pattern of insider trading that his conduct encompassed and his nearly $900,000 of profits – would represent an unusually lenient sentence that would be inconsistent with the sorts of sentences imposed on similarly situated defendants.

Collateral Consequences

The defendant next contends that the defendant has already suffered such severe collateral consequences as a result of the prosecution that a sentence of time served is sufficient.   The defendant specifically points to the fact the defendant will be deported as a non-citizen (Def. Sentencing Memo. at 6), and that the defendant has suffered various other collateral consequences, including "severe physical, emotional, and economic challenges due to his deportation" and loss of "a very prestigious job, which represented the culmination of his successful American education and hard work."   (Def. Sentencing Memo at 25).   The defendant also points to his dimmed future career prospects as a result of his conviction.   (*Id.* at 26).   While the Government does not dispute that the defendant has suffered significant adverse consequences as a result of his prosecution and conviction in this matter, that fact alone cannot justify a sentence of time served.

With respect to his impending deportation, treating this fact alone as a basis for a time served sentence would amount to a "non-citizen" bonus where non-citizens who commit crimes in the United States do not face the same custodial sentences as U.S. citizens who commit the same sorts of offenses because U.S. citizens do not face the additional adverse consequence of deportation as a result of their conviction.   In any case, the adverse immigration consequences here—which result from the defendant's choice to abuse the laws of this country notwithstanding

16

his status—cannot justify a sentence of time served in this case, given the nature and circumstances of the offense and need for just punishment.

As for the other collateral consequences the defendant has suffered as a result of his conviction, while these consequences are certainly a factor the Court should consider in fashioning an appropriate sentence under Section 3553(a), such collateral consequences should not be given undue weight and do not ultimately dictate that a lenient sentence of time served is appropriate. Indeed, courts appropriately disfavor placing undue weight on the collateral consequences that a defendant in a white-collar job suffers as a result of a conviction. Giving such an argument undue weight would unfairly favor white collar criminals above others. *See, e.g., United States v. D'Amico*, 496 F.3d 95, 107 (1st Cir. 2007) (vacating former city councilor's four-month sentence for Hobbs Act extortion and false statements offenses, which sentence varied downwardly 88% from a Guidelines range of 31 to 44 months, where the variance was premised significantly on the collateral consequences of conviction faced by the defendant), *vacated on other grounds by* 552 U.S. 1173 (2008); *id.* at 106-07 (noting that giving substantial variances in sentencing to white collar defendants who "often have achieved more tangible successes than other defendants . . . will inevitably lead to sentencing courts treating white collar defendants more leniently (in the relative sense) simply because of their societal status -- a result that would be contrary to one of Congress' primary objectives in enacting the current federal sentencing scheme"); *see also United States v. Rattoballi*, 452 F.3d 127, 135 (2d Cir. 2006) (noting that "[e]very convicted felon suffers from the indignity and ill-repute associated with a criminal conviction," and that reliance on such so-called "collateral consequences is contrary to 18 U.S.C. § 3553(a)(6), which calls for a reduction in unwarranted disparities among similarly situated defendants").

The defendant also cites to *United States v. Blaszczak*, 17 Cr. 357 (LAK), in arguing that a term of incarceration will place significant burdens on his family members. (Def. Sentencing

Memo at 28).   While Blaszczak faced a Guidelines range of 63 to 78 months' imprisonment, Judge Kaplan only imposed a sentence one year and one day due to the condition of the defendant's wife, who had a degenerative eye disease, and a child who would be severely burdened if the defendant served a lengthy term in prison.   (Def. Sentencing Memo at 29).   The defendant claims that he is similarly situated to the defendant in *Blaszczak*, but he is not.   Unlike in *Blaszczak*, the defendant here has no children, no spouse, and no dependents.   Prior to the commission of this offense, he lived in the United States away from his parents and was not relied upon to provide daily care or support to his parents.   Indeed, the defendant, remarkably, points to the need for him to support his brother—and co-defendant—who lost his job as a result of his participation in the criminal conduct at issue here.   (Def. Sentencing Memo at 29).   While it may be that the collateral consequences on innocent third parties would justify a lesser term of incarceration in some cases, it can hardly be said that the goals of sentencing would be advanced where the defendant seeks to lessen the impact of a just sentence on his co-conspirator.   Thus, unlike in *Blaszczak*, a term of incarceration here will not create any "wreckage" for any children or other dependents.

<u>The Defendant's Motivation for the Offense</u>

The defendant further contends that his motive for commission of the offense militates in favor of a non-custodial sentence.   The defendant spends a substantial portion of his submission explaining that the motivation for his offense was due to guilt that his parents expended a good deal of their financial resources to pay for his education.   According to the defendant's submission, he committed this crime in order to repay his parents with his illicit profits.   (Def. Sentencing Mem. at 1-6).   This claim deserves substantial scrutiny by this Court in imposing sentence.   In this regard, there are a few facts that bear emphasis.

First, even in the defendant's own telling, his parents "spent nearly half a million dollars on his and his brother's education."   (Def. Sentencing Memo at 3).   But, as is described above,

the defendant personally reaped approximately nearly $900,000 in profits from his participation in the scheme.   That trading and the principal the defendant used to purchase the crypto assets prior to Coinbase listing announcements only increased in the last two months of the scheme – by which point the defendant had already made profits that exceeded the amounts his parents spent on his and his brother's education.   Thus, it appears that the defendant kept trading – and actually only escalated his trading – even after he had made enough money to repay his parents for his educational costs and then some.

Second, the defendant does not ever appear to have taken any steps to actually send his parents any of his hundreds of thousands of dollars in insider trading profits.   Indeed, of the nearly $900,000 in profits the defendant reaped, he maintained almost all of it – nearly $700,000 – in an anonymous Ethereum wallet he controlled and a Kucoin account held under a pseudonym email address.   The Government seized these assets pursuant to seizure warrants.   One would think that if the driving purpose for the defendant's commission of this offense was to repay his parents for hundreds of thousands of dollars in educational costs that by February 2022, when he had already reaped hundreds upon hundreds of thousands of dollars in gains, that the defendant would have started sending his gains back to his parents. Instead he kept that money in cryptocurrency wallets and accounts that he controlled, and continued using those funds to trade in larger and larger magnitudes.

Third, and finally, the reality of the defendant's actual financial condition prior to his arrest further undermines the notion that committing this offense was the sole means by which he could have begun repaying his parents for his education.   The defendant was not in dire financial circumstances.   To the contrary, he had received a stellar education in the United States and held

a high paying position at a tech company as a senior product manager.[9]   The defendant as a single

male with no dependents who reported adjusted gross income of approximately $███████ in 2020

and approximately $██████ in 2021.   (PSR ¶ 86).   He could have easily set aside some portion

of his substantial earnings to repay his parents over time.   Moreover, the defendant had a total net

worth of approximately $███████ at the time of his PSR interview.[10]   This figure did not include

various assets he had already sold off by the time of the PSR interview, which included his sale of

██████████████████████████████████████████████████████████████████

██████████████████.   (PSR ¶ 83).   The defendant had plenty of other options short of illegally trading

on stolen information to repay his parents for his education, and it appears highly doubtful that this

was the sole motivating factor for his commission of this offense.

> COVID-19

The defendant also cites to COVID-19 and the conditions of confinement as a basis for a

sentence of time served.   The defendant is a young, healthy man (PSR ¶¶ 69-70) and vaccines are

now widely available.   While COVID-19 is undoubtedly serious, times have shifted significantly

since 2020.   There is nothing in the defendant's medical record that suggests he is at any

particularly unique risk from COVID-19.   Given the passage of time and the medical and societal

progress achieved in recent years, the circumstances of the COVID-19 pandemic do not weigh in

favor of a sentence of time served.

---

[9] According to the PSR, the defendant was earning approximately ███████ per year plus a bonus, which in 2021 was approximately ██████.

[10] The defendant was interviewed on October 3, 2022 by the Probation Office.   (PSR ¶ 59). Notably, the defendant did not reveal in describing his assets (PSR ¶¶ 82-86) the nearly $700,000 worth of crypto assets that he controlled and that the Government subsequently identified and seized pursuant to seizure warrants on or about November 28, 2022.

## **CONCLUSION**

The Court should sentence the defendant to a sentence of 10 to 16 months' imprisonment, which would be sufficient but not greater than necessary to serve the legitimate ends of sentencing.[11]

Dated: New York, New York
        January 4, 2023

                                    Respectfully submitted,

                                    DAMIAN WILLIAMS
                                    United States Attorney

                    By:    __/s/ Noah Solowiejczyk_____
                                    Noah Solowiejczyk
                                    Nicolas Roos
                                    Assistant United States Attorneys
                                    Tel. (212) 637-2473/2421

---

[11] The Court should also order forfeiture and restitution.  With respect to forfeiture, the parties have also agreed that forfeiture is warranted.  A consent preliminary order of forfeiture was entered at the time of the defendant's guilty plea in the amount of $54,100, which represented the gain amount known to the Government at the time of the plea.  In light of the Government's discovery of total gains of approximately $892,500, the Government anticipates, after further consultation with defense counsel prior to sentencing, providing the Court with an amended consent preliminary order of forfeiture in that full amount.   With respect to restitution, Coinbase has indicated to the Government that it intends to seek restitution.  Because the Government is still gathering information relevant to the amount of the victim's losses, it respectfully requests that the Court set a deadline for the final determination of restitution no more than 90 days after sentencing.  *See* 18 U.S.C. § 3664(d)(5).